**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

FILED

APR 1 6 2008

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| Samuel Kleiner, | § |
| | § |
| *Plaintiff, on behalf of* | § |
| *himself and all others* | §    Civil Action No.  5:08cv218-RF |
| *similarly situated,* | § |
| | § |
| v. | § |
| | § |
| Southwest Airlines Co., | § |
| | § |
| *Defendant.* | § |

## FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................. 2

**TABLE OF EXHIBITS** .................................................................. 3

**INTRODUCTION** ........................................................................ 4

**PARTIES** ................................................................................... 8

**CLASS ALLEGATIONS** ............................................................. 9

**JURISDICTION AND VENUE** .................................................... 12

**STANDING** ............................................................................... 13

**NON-PREEMPTION** ................................................................... 16

**FACTS** ..................................................................................... 20

    **I.**   **Southwest Warranted That It Was In Compliance With All Applicable Federal Air-Safety Regulations** ........................................ 20

    **II.**  **Southwest Repeatedly Violated Federal Airworthiness Directives And Other Federal Air-Safety Regulations** ............................... 21

    **III.** **Southwest's Violations Were Not Merely Technical: Southwest Put Passengers' Lives At Risk** ............................................ 29

    **IV.** **Until Recently, Southwest Got Away With Endangering Its Customers And Others** ....................................................... 34

**CAUSES OF ACTION** ................................................................. 43

    **I.**   **Breach of Express Warranty** ............................................... 43

    **II.**  **Texas Deceptive Trade Practices Act** .................................... 46

**DAMAGES** ................................................................................ 50

**ATTORNEYS' FEES** ................................................................... 56

**CONDITIONS PRECEDENT** ...................................................... 56

**PRAYER FOR RELIEF** ............................................................... 56

## TABLE OF EXHIBITS

A            Picture of 1988 explosive decompression due to fuselage cracks

B            Letter from Office of Special Counsel to the Secretary of Transportation

C            Southwest Airlines Co. Sixth Revised Contract of Carriage – Passenger

D            Southwest Airlines Safety Commitment

E            Letter from the FAA to Southwest Airlines imposing fine

F            Airworthiness Directive (AD) 2004-18-06

G            Statement of Nicholas A. Sabatini, Associate Administrator for Safety, FAA, before the Committee on Transportation and Infrastructure, United States House of Representatives, April 3, 2008

H            National Transportation and Safety Board, Aircraft Incident Report, Aloha Airlines, Flight 243 Boeing 737-200, N73711

I            Joint Statement of Herbert D. Kelleher, Executive Chairman, and Gary C. Kelly, CEO, of Southwest Airlines Co.,  before the Committee on Transportation and Infrastructure, United States House of Representatives, April 3, 2008

J            Statement of C. Bobby Boutris before the Committee on Transportation and Infrastructure, United States House of Representatives, April 3, 2008

K            Statement of Douglas E. Peters before the Committee on Transportation and Infrastructure, United States House of Representatives, April 3, 2008

L            U.S. Office of Special Counsel Report of Disclosures Referred For Investigation OSC FILE Nos. DI-07-2793 and DI-07-2868

M            Statement of The Honorable James L. Oberstar, Chairman, House Committee on Transportation and Infrastructure, United States House of Representatives, April 3, 2008

N            Federal Aviation Administration Press Release, April 2, 2008

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), Plaintiff files this First Amended Complaint as a matter of course before being served with a responsive pleading:

## INTRODUCTION

1.      Southwest Airlines violated federal air-safety regulations governing the maintenance and operation of its Boeing 737 fleet and, as a result, gambled with the welfare, safety, and lives of thousands of passengers, like Kleiner, to whom Southwest had falsely warranted that travel on its aircraft complied with all federal air-safety regulations, including those of the Federal Aviation Administration (FAA). Southwest's violations included failing to inspect for the same kinds of cracks in the fuselage that, in 1988, resulted in an Aloha Airlines aircraft's "explosive decompression" in midair. *See* Exhibit A (picture of the Aloha Airlines plane). They also included failing to repair defective rudders and tail spindles, failing to repair damage from midair lightning strikes, and otherwise failing to comply with the FAA's so-called Airworthiness Directives and with Southwest's own FAA-approved Flight Operations Manual. Southwest's repeated violations of federal law were facilitated by its cozy relationship with certain FAA field officials — a relationship recently revealed by two FAA whistleblowers and documented by the preliminary results of ongoing investigations by the United States Office of Special Counsel and the House Committee on Transportation and Infrastructure. *See* Exhibit B (letter from the Office of Special Counsel to the Secretary of Transportation).

2.      Samuel Kleiner brings this action on behalf of everyone who purchased flights from Southwest and who, within the past four years, was flown by Southwest on an aircraft in violation of federal air-safety regulations or who currently holds a ticket for

future travel on Southwest.  Southwest violated federal law by flying aircraft in violation of federal air-safety regulations, which, if obeyed, would have required that the aircraft be grounded.  Southwest also thereby violated its express warranty, made repeatedly in its advertising and formalized in the Contract of Carriage that it incorporates in every ticket it sells, that "[a]ll transportation is sold and all carriage is performed subject to compliance with all applicable laws and governmental regulations, including those of the U.S. Department of Transportation, the Federal Aviation Administration, and the Transportation Security Administration, many of which are not specified herein but are nonetheless binding on Carrier and all passengers."  *See* Exhibit C at para. 125 (Southwest Airlines Contract of Carriage); *see also, e.g.,* Exhibit D (Southwest Airlines Safety Commitment).

3.      Kleiner and the class members were injured by Southwest's breach of express warranty in that the fair market value of the service they received, travel on an unsafe or illegal aircraft, was less than the fair market value of the service as Southwest warranted it, travel on a safe and legal aircraft.  Had Southwest told Kleiner and the class members that it was violating federal air-safety regulations, Kleiner and the class members would not have flown Southwest at all.  This reflects the distinct fact that the fair market value of what Southwest delivered, flights on unsafe or illegal aircraft, was less than the value of what Southwest warranted it would deliver, flights on safe and legal aircraft.  Because Kleiner and the class members paid for flights on safe and legal aircraft, the difference in fair market value between such flights and flights on unsafe or illegal aircraft constitutes actual damages they suffered.  The precise amount of this difference in value is ultimately a question of fact for the jury.  *See* paras. 91–92, *infra.*

5

4.     Southwest is defending itself in Congress and in the court of public opinion by contending that its passengers (and countless crew members and innocent bystanders) were never really in danger because the federal air-safety regulations that Southwest violated are not essential to safety. Southwest admits that it broke the law, but claims that no one was thereby endangered. In support of this claim, it offers the testimony of Boeing, which credits Southwest with singlehandedly keeping its 737 production lines open, and a hired air-safety expert, Greg Feith. Ironically, however, Southwest also claims that it was behind one of the very airworthiness directives that it admittedly violated, the directive requiring inspection for fuselage cracks. Either Southwest was wrong when it advocated this directive as a necessary safety measure to be imposed on all operators of 737's in light of the 1988 Aloha Airlines midair explosion, or Southwest is wrong now, when, in the face of a congressional investigation and a month and a half of bad publicity, it claims that its own violations of this directive put no one at risk. Regardless, it is crystal clear that Southwest flew aircraft that, had Southwest obeyed the FAA's safety regulations, could not legally have been flown and would have been grounded.

5.     Southwest's rhetorical defense should be rejected for a reason at least as old in the law as Lord Coke's rejection of the English physicians' guild's deciding a case between itself and its member, Dr. Bonham: "*quia aliquis non debet esse Judex in propria causa, imo iniquum est aliquem sui rei esse judicem.*" *See, e.g., Brooks v. Dretke*, 444 F.3d 328 (5th Cir. 2006) (citing Coke's decision: "*Dr. Bonham's Case*, 77 Eng. Rep. 646, 652 (C.P. 1610) (Coke, J.) (stating that no man shall be a judge in his own cause))"). The FAA — not Southwest or any other airline it regulates — is the proper

judge of whether a violation of its regulations should result in grounding an aircraft. When Southwest decided to roll the dice by flying aircraft in violation of federal air-safety regulations, it replaced the FAA with itself as judge of air safety; and, in its usurped role, Southwest traded off passengers' interest in air safety with its own interest in maximizing profits.

6.      Southwest's violation is compounded by the fact that it expressly warranted its compliance with federal air-safety regulations to its passengers and made its until-now-exceptional safety record a centerpiece of its marketing campaign. There is a big difference between a promise to abide by the air-safety rulings of a neutral arbiter charged with protecting the public — the FAA — and a promise to conduct whatever safety measures seem appropriate (or convenient or expedient) at the moment. Southwest chose and touted the first promise, and reaped a harvest of paying passengers as a result; it should not now be able to avoid enforcement of this promise by slipping in the second one instead. Plaintiffs seek only to enforce Southwest's promise to its passengers.

7.      No doubt, Southwest will protest to this Court that this lawsuit is somehow inappropriate or unwarranted merely because the thousands of passengers whose safety and lives were the subject of Southwest's illicit wager were lucky enough to have landed alive and unscathed. "No harm, no foul" will be the crux of Southwest's defense. Properly understood, this "defense" is none at all, although it does articulate precisely the reckless disregard for the safety and lives of Southwest's passengers from which this dispute was borne.

8.      That Kleiner and the class members have justiciable claims is axiomatic. Each purchased a ticket containing Southwest's express warranty that transportation on

7

its airline complied with all applicable safety laws and regulations. Southwest violated that warranty and, as a result, longstanding, fundamental principles of law entitle Kleiner and the class members to recover, as their actual damages, the difference between the value of the fully safety-compliant travel as warranted by Southwest and the travel actually received — flights on aircraft that should never have been allowed to depart at all. That Kleiner and his fellow passengers were fortunate enough to escape personal injuries — or worse — is wholly irrelevant to the actual, contractual damages they suffered when they overpaid for travel on aircraft falsely warranted by Southwest to comply with all safety regulations and laws. *See* paras. 87–93, *infra* (DAMAGES).

9.       The issue before this Court is not "no harm, no foul." To the contrary, the issue before this Court really concerns whether Southwest can wager a clandestine bet on the safety and lives of its passengers, while simultaneously warranting to these passengers a fictional commitment to safety. If Southwest were to fly planes with untrained pilots — or with insufficient fuel — or without life vests or other necessary safety equipment — would it be entitled to keep the entire fare it charged its unwitting passengers merely because, by luck or skill, Southwest managed to land them unscathed? Thankfully, that is neither the law nor the agreement between Southwest and its passengers, including Kleiner.

## PARTIES

10.       Samuel Kleiner is a citizen of Arizona. He purchased travel on Flight 2949 departing from Chicago Midway (MDW) and arriving in Baltimore (BWI) on Saturday, May 31, 2008, and on Flight 3662 departing from Baltimore (BWI) and arriving at Chicago Midway (MDW) on Thursday, June 5, 2008. He purchased travel on

and traveled on Flight 1394 departing from Washington Dulles (IAD) and arriving in Chicago Midway (MDW) on Thursday, November 29, 2007; Flight 3232 departing from Chicago Midway (MDW) and arriving in Washington Dulles (IAD) on Sunday, December 2, 2007; Flight 1013 departing from Tucson (TUS) and arriving in Baltimore (BWI) on Monday, September 3, 2007; Flight 844 departing from Detroit (DTW) and arriving in Chicago Midway (MDW) on Monday, August 13, 2007; Flight 2221 departing from Chicago Midway (MDW) and arriving in Tucson (TUS) on Monday, August 13, 2007; and Flight 4290 departing from Chicago Midway (MDW) and arriving in Washington Reagan (DCA) on Tuesday, June 5, 2007.

11.     Southwest Airlines Co. is a publicly traded Texas corporation and may be served at its principal place of business and corporate headquarters at 2702 Love Field Drive, Dallas, Texas, or by serving its registered agent for service of process, Corporation Services Company d/b/a CSC — Incorporating Service Company, 701 Brazos Street, Austin, Texas 78701.

12.     Counsel for Southwest, Vinson & Elkins, LLP, has agreed to accept service on Southwest. Accordingly, this First Amended Complaint is being served, along with the Original Complaint, on Southwest through its counsel.

## CLASS ALLEGATIONS

13.     Kleiner brings this action on behalf of everyone who purchased flights from Southwest and who, within the past four years, was flown by Southwest on an aircraft in violation of federal air-safety regulations or who currently holds a ticket for future travel on Southwest. This action satisfies the prerequisites of Rule 23(a)(1)–(4) for maintenance as a class action. The class members include every passenger on at least

61,242 flights — the number of flights that Southwest flew in violation of just one FAA Airworthiness Directive, which mandated inspections for fuselage cracks, *see* Exhibit D (letter from the FAA to Southwest Airlines imposing fine) — and are therefore too numerous for joinder. The information necessary to define the class with respect to particular flights and hence to identify the class members, that is, the aircraft with respect to which Southwest violated federal air-safety regulations and the routes on which Southwest flew those aircraft, is uniquely in the possession and control of Southwest. With this information, Kleiner will likely be able to define the class further. Kleiner's claims are typical, including because, like the class members, he flew Southwest while Southwest was violating federal air-safety regulations. Kleiner paid for his tickets in the ordinary manner and is not otherwise distinguishable in any relevant way from all other people who purchased tickets from Southwest and who Southwest flew on planes in violation of federal air-safety regulations.

14. Certification is appropriate under Rule 23(b)(1)(A), Rule 23(b)(2), and Rule 23(b)(3). Whether the express warranty in Southwest's Contract of Carriage requires it to comply with all applicable federal air-safety regulations is central to this action. Because this Contract of Carriage is referred to and incorporated in all Southwest tickets, inconsistent adjudications respecting this warranty would subject Southwest to different standards of conduct for different passengers. This problem is most acute with respect to passengers on the same plane, since Southwest must comply or not comply with federal air-safety regulations on a plane-by-plane, not a passenger-by-passenger, basis. It either inspects for fuselage cracks on a plane or it does not; it either repairs lightning damage to a plane or it does not. Because Southwest's actions necessarily

affected large groups of passengers — at a minimum, all passengers who flew on a particular plane — Southwest acted on grounds that apply generally to the class. Moreover, many class members are repeat Southwest passengers who would consider flying or who intend to fly Southwest in the future. Accordingly, declaratory and injunctive relief commanding Southwest to comply with all applicable federal air-safety regulations is appropriate for the class as a whole.

15.     The class members' claims turn on at least the following common questions of fact and law: (1) the common question of fact whether Southwest violated federal air-safety regulations (it did); (2) the common question of law whether the language in paragraph 125 of Southwest's Contract of Carriage constitutes an express warranty that it is in compliance with all applicable federal air-safety regulations (it does); (3) the common question of law whether Southwest's violations of federal air-safety regulations constitute breaches of this warranty (they do); (4) the common question of law whether the difference between the fair market value of Southwest's flights as Southwest warranted them, flights on safe and lawful aircraft, and the fair market value of Southwest's flights as Southwest delivered them, flights on unsafe or illegal aircraft, constitutes actual damages to the class members resulting from this breach of warranty (it does); and (5) the common question of fact what the amount of this difference in value is (a question ultimately for the jury to decide, *see* paras. 91–93, *infra* (collecting cases)).

16.     A common concern in class actions that variance in state law undermines the commonality of questions of law is not present in this case because the class members seek only to enforce a contractual promise made by Southwest — which they may do

11

under the laws of every applicable state.  As the Supreme Court, adopting the Solicitor

General's argument, put it:

> **Because contract law is not at its core diverse, nonuniform, and
> confusing, we see no large risk of nonuniform adjudication** inherent in
> "[s]tate-court enforcement of the terms of a uniform agreement prepared
> by an airline and entered into with its passengers nationwide."

*American Airlines v. Wolens*, 513 U.S. 219, 233 n.8 (1995) (emphasis added); *see also*

*Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 289–90 (5th Cir. 2002)

(in aviation case, holding contract law, in particular, fraudulent inducement defense,

uniform).  Moreover, complications arising from state-law statutory variance with regard

to product warranties (much less specialized statutes governing automotive or other

specialized warranties) do not arise in this case because Southwest sold a service: passage

on its supposedly safety-compliant aircraft.  *See Hodges v. Delta Airlines, Inc.*, 44 F.3d

334, 336 (5th Cir. 1995) (*en banc*) (defining air transportation as a service).

17.     Kleiner is an adequate class representative.  Kleiner has been personally

involved in investigating this case before and after filing his complaint.  Kleiner has

retained qualified class-action counsel.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action under the Class

Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action, the plaintiff class

seeks more than $5 million in damages, and there is minimal diversity because there is

diversity between at least one class member and Southwest (for example, between

Kleiner, a citizen of Arizona currently resident in Illinois, and Southwest, a Texas

corporation headquartered in Texas).    This Court has personal jurisdiction over

Southwest because Southwest has pervasive and intentional business contacts in this

district: it sells tickets in this district; flies into, out of, and through this district; and has employees in this district.   Venue is proper in this district under 28 U.S.C. § 1391 because Southwest resides in this district as *resides* is defined for purposes of § 1391, *see id.* §§ 1391(a)(1), 1391(c) (corporate defendant resides in any district in which, if that district were a state, the defendant would be subject to personal jurisdiction), and a substantial part of the events and omissions involved took place here, *see id.* § 1391(a)(2).

## STANDING

19.    Kleiner has constitutional standing to assert his claim.   "The requisite elements of Article III standing are well established: 'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"   *Hein v. Freedom From Religion Foundation, Inc.*, 127 S. Ct. 2553, 2562 (2007) (*quoting Allen v. Wright*, 468 U.S. 737, 751 (1984)). Kleiner alleges a "personal" injury in that he paid for and Southwest promised him services, namely, flights on safe and legal aircraft, worth more than the services that Southwest delivered, namely, flights on unsafe and illegal aircraft.   Kleiner alleges that the value of what Southwest delivered, flights on unsafe and illegal aircraft, was less than the value of the consideration he paid.   *Cf. Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) (affirming dismissal of claim for want of injury under RICO because the plaintiffs "[did] not allege that the value of the cards that they did receive is less than the consideration paid").

20.    In a breach-of-warranty class action against General Motors, the Fifth Circuit specifically held that this type of injury — injury stemming from the plaintiffs'

13

"overpayment" because of "a difference between what they contracted for and what they

actually received" — satisfies Article III's standing requirement:

> Plaintiffs allege that each plaintiff suffered economic injury at the moment she purchased a DeVille because each DeVille was defective. . . . **Plaintiffs seek recovery for their actual economic harm** (**e.g., overpayment,** loss in value, or loss of usefulness) **emanating from the loss of their benefit of the bargain. Notably in this case, plaintiffs may bring claims under a contract theory based on the express and implied warranties they allege.** Whether recovery for such a claim is permitted under governing law is a separate question; **it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered.** *See Parker v. District of Columbia,* 478 F.3d 370, 377 (D.C. Cir. 2007) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." (citing *Warth v. Seldin,* 422 U.S. 490, 401–02, 95 S. Ct. 2197, 45 L.Ed.2d 343 (1975))). **We therefore conclude that plaintiffs have established a concrete injury in fact and have standing to pursue this class action.**

*Cole v. General Motors Corp.,* 484 F.3d 717, 722–23 (5th Cir. 2007) (emphasis added).

21.     The Fifth Circuit has expressly distinguished breach-of-warranty, benefit-

of-the-bargain claims like Kleiner's, which do plead a constitutional injury, from those

product-defect claims that it has dismissed for want of injury sufficient to support

constitutional standing.  In *Rivera v. Wyeth-Ayerst Laboratories,* 283 F.3d 315 (5th Cir.

2002), the Fifth Circuit noted:

> The plaintiffs' most plausible argument for finding they have suffered "invasion of a legally protected interest" is their claim they were denied "the benefit of the bargain" due to them under general, contract law type principles.  The plaintiffs do not actually argue breach of contract — likely a smart decision, given that there was no contract.

*Id.* at 320.  The Fifth Circuit expressly distinguished the contract-law theory on which

Kleiner relies, breach of an express warranty made by the defendant directly to him, from

the tort-law product-defect theory on which the *Rivera* plaintiffs necessarily (since Wyeth

made no contractual warranty to them) relied.  *Id.* at 319–21.  *Rivera* rejects only the

14

latter theory, not the former one.  The *Rivera* plaintiffs lost because of a kind of contort confusion: they brought a tort claim (product defect) without tort injuries (physical or emotional harm) or, alternatively, had contract injuries (out-of-pocket overpayment or benefit of the bargain) without a contract claim (breach of warranty).  As the Fifth Circuit put it:

> The confusion arises from the plaintiffs' attempt to recast their product liability claim in the language of contract law.  The wrongs they allege — failure to warn and sale of a defective product — are products liability claims.  Yet, the damages they assert — benefit of the bargain, out of pocket expenditures — are contract law damages.

*Id.* at 320.  Kleiner avoids a similar confusion because he seeks contract-law damages, namely, out-of-pocket overpayment and benefit of the bargain, on a well-recognized contract-law claim, namely, breach of express warranty.

22.    Kleiner's injury is concrete, particularized, and actual, not conjectural or hypothetical.  The Supreme Court has defined the injury-in-fact requirement in the abstract as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Kleiner is suing for the injury that Southwest caused him.  Similarly, each class member is suing for the injury that Southwest caused that class member.  Kleiner's and the class members' injuries are therefore concrete and particularized.  Kleiner's injury occurred when Southwest delivered flights on unsafe or illegal aircraft: it was at that time and no later that Southwest breached its warranty to provide safe and legal aircraft in compliance with federal air-safety regulations.  Kleiner's injury is therefore an actual injury and, since it

15

happened with certainty, involves no conjecture or hypothesis. The same is true for the class members because their injuries are just like Kleiner's.

23.     Kleiner also satisfies the causation and redressibility standing requirements. Southwest directly caused Kleiner's injury by warranting that its flights were on safe and legal aircraft and delivering, instead, flights on unsafe or illegal aircraft; therefore, Kleiner's injury is fairly traceable to Southwest. Kleiner's overpayment injury, with respect to past flights, is a loss of money that can be cured by money damages; with respect to future flights, declaratory or injunctive relief will cure Kleiner's injury by commanding Southwest to comply with federal air-safety regulations. Kleiner's injury is therefore likely to be redressed by the relief he seeks. Because Kleiner and the class members all allege the same claim, namely, that Southwest breached its warranty of safe and legal flights by delivering unsafe or illegal flights, the class members have constitutional standing for the same reasons that Kleiner has constitutional standing.

## NON-PREEMPTION

24.     State remedies for Southwest's violations of federal air-safety regulations are not preempted by the Airline Deregulation Act because these remedies are remedies for Southwest's violations of federal air-safety regulations, not conflicting or supplemental state regulations, and are remedies for Southwest's violations of a contractual warranty that it imposed on itself, not for violation of extra-contractual standards imposed on Southwest by the states. Kleiner and the class members do not attempt to impose any air-safety regulation on Southwest other than all existing federally mandated regulations, with which Southwest expressly warranted compliance. Simply put, had Southwest fully complied with existing air-safety regulations (it did not), neither

Kleiner nor the class members would have a cognizable claim.  The Airline Deregulation

Act contains two relevant provisions, presently codified as follows:

> **(b) Preemption — (1)** Except as provided in this subsection, a State,
> political subdivision of a State, or political authority of at least 2 States
> may not enact or enforce a law, regulation, or other provision having the
> force and effect of law related to a price, route, or service of an air carrier
> that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

> **(c) Additional remedies. —** A remedy under this part is in addition to any
> other remedies provided by law.

49 U.S.C. § 40120(c).

     25.    The class members' claims for breach of warranty are not preempted

under § 41713(b)(1) because they are claims for breach of an obligation that Southwest

placed on itself by entering into its Contract of Carriage.  A state does not "enact or

enforce a law, regulation, or other provision having the force and effect of law" by

enforcing a contractual obligation assumed by an airline to its passengers — no matter

the subject matter of that obligation.  As the Supreme Court put it: "We hold that the

ADA's preemption prescription bars state-imposed regulation of air carriers, but allows

room for court enforcement of contract terms set by the parties themselves." *American*

*Airlines, Inc. v. Wolens*, 413 U.S. 219, 222 (1995).  This is because contract terms are not

sensibly regarded as state regulation:

> American maintains, and we agree, that "Congress could hardly have
> intended to allow the States to hobble [competition for airline passengers]
> through the application of restrictive state laws." Brief for Petitioner 27.
> <u>We do not read the ADA's preemption clause, however, to shelter
> airlines from suits alleging no violation of state-imposed obligations,
> but seeking recovery solely for the airline's alleged breach of its own,
> self-imposed undertakings. As persuasively argued by the United
> States, terms and conditions airlines offer and passengers accept are
> privately ordered obligations "and thus do not amount to a State's</u>

17

> **'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§] 1305(a)(1)."** Brief for United States as *Amicus Curiae* 9. *Cf. Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 526, 112 S.Ct. 2608, 2612, 120 L.Ed.2d 407 (1992) (plurality opinion) ("[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement ... imposed under State law' within the meaning of [Federal Cigarette Labeling and Advertising Act] § 5(b)."). A remedy confined to a contract's terms simply holds parties to their agreements — in this instance, to business judgments an airline made public about its rates and services.

*Id.* at 228–29 (emphasis added).

26.     The Supreme Court's holding that the Airline Deregulation Act does not preempt standards imposed by private contracts or state-law remedies for breach of such standards is consistent with, and, in fact, necessary to effect, the Airline Deregulation Act's purpose of deregulating the airline industry and preventing, by preemption, states from re-regulating that industry:

> **The ADA,** as we recognized in *Morales*, 504 U.S., at 378, 112 S.Ct., at 2034, **was designed to promote "maximum reliance on competitive market forces."** 49 U.S.C.App. § 1302(a)(4). **Market efficiency requires effective means to enforce private agreements.** See Farber, Contract Law and Modern Economic Theory, 78 Nw.U.L.Rev. 303, 315 (1983) (remedy for breach of contract "is necessary in order to ensure economic efficiency"); R. Posner, Economic Analysis of Law 90-91 (4th ed. 1992) (legal enforcement of contracts is more efficient than a purely voluntary system). As stated by the United States: "The stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on needs perceived by the contracting parties at the time." Brief for United States as Amicus Curiae 23. **That reality is key to sensible construction of the ADA.**

*Id.* at 230 (emphasis added).

27.     The Fifth Circuit, writing unanimously through Chief Judge Jones, applied *Wolens* to hold state breach-of-contract law not preempted by the Airline Deregulation Act in *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282 (5th Cir. 2002):

> In *Wolens*, the Court expanded upon ADA preemption as a device to protect the deregulation of the airline industry by preventing "application of restrictive state laws." 513 U.S. at 228, 115 S.Ct. at 824. Nevertheless, "the ADA's preemption clause [does not] shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Id.* **The ADA does not preempt "state-law-based court adjudication of routine breach-of-contract claims" so long as there is "no enlargement or enhancement [of the contract] based on state laws or policies external to the agreement."** *Id.* at 232-33, 115 S.Ct. at 826.

*Id.* at 287 (emphasis added).   One basis for the Fifth Circuit's decision was its observation, shared by the Supreme Court, that "contract law is, at its 'core,' uniform and non-diverse" so that "there is little risk of inconsistent state adjudication of contractual obligations" — that is, by enforcing the common law of contract, states are not in a meaningful sense reregulating airlines because they are not imposing their own state-specific standards:

> When pleaded as a defense to a contract, fraudulent inducement is related to the fundamental issue in contract actions: is there an enforceable agreement? A fraudulently induced party has not assented to an agreement because the fraudulent conduct precludes the requisite mutual assent. *See* RESTATEMENT (SECOND) OF CONTRACTS § 164 (1979). Fraudulent inducement is an elementary concept in the law of contracts, and is intended to shield a party from liability in a contract action only when another party has procured the alleged contract wrongfully. *United States v. Texarkana Trawlers*, 846 F.2d 297, 304 (5th Cir.1988). **The Court reasoned in *Wolens* that because contract law is, at its "core," uniform and non-diverse, there is little risk of inconsistent state adjudication of contractual obligations.** 513 U.S. at 219 n. 8, 115 S.Ct. at 826. **Fraudulent inducement is among those core concepts as it relates to the validity of mutual assent. The defense does not reflect a state policy seeking to expand or enlarge the parties' agreement. Therefore, Lyn-Lea's fraudulent inducement defense is not preempted by the ADA.**

*Id.* at 289–90 (emphasis added).   Because the class members' claims are based on Southwest's breaches of its own Contract of Carriage, which merely incorporates federal

19

air-safety regulations as direct contractual obligations, they are not subject to Airline

Deregulation Act preemption.

## FACTS

**I.      Southwest Warranted That It Was In Compliance With All Applicable Federal Air-Safety Regulations**

28.     Southwest refers to and incorporates its Contract of Carriage in every

ticket, paper and electronic, that it sells.  Paragraph 125 of this Contract of Carriage is a

warranty that Southwest is in compliance with and is bound by all applicable federal air-

safety regulations:

> 125.  <u>Compliance with Law and Governmental Regulations</u> (Issued Mar. 13, 2000; Effective Mar. 13, 2000)

> All transportation is sold and all carriage is performed subject to compliance with all applicable laws and governmental regulations, including those of the U.S. Department of Transportation, the Federal Aviation Administration, and the Transportation Security Administration, many of which are not specified herein but are nonetheless binding on Carrier and all passengers.

Ex. C at 35 (Southwest Contract of Carriage).

29.     Southwest repeats its commitment to safety and compliance with federal

air-safety regulations throughout its internal documents and its external marketing.  In the

Southwest Airlines Safety Commitment posted on its web site, for example, Southwest

declares:

> Safety is the very foundation of the aviation industry, and it must be Southwest's number one priority to ensure the personal Safety of each Southwest Airlines Customer and Employee. . . .

> • All Southwest Airlines Employees, from Leadership to Frontline Employees, are responsible for establishing the highest level of Safety in our operation and workplace;

> • All Southwest Airlines Employees, from Leadership to Frontline

20

> Employees, are responsible for compliance with all governmental
> safety regulations and guidelines, as well as Company policies and
> procedures.

Ex. D at 1.  Southwest uses this safety commitment to distinguish itself from other

airlines.  This marketing strategy has been remarkably successful: last year, Southwest

flew more passengers than any other commercial carrier.

30.    Paragraph 125 of the Contract of Carriage makes Southwest's repeated

promises to its passengers more than empty words.  By extending to them an express

warranty of "compliance with all applicable laws and governmental regulations,"

Southwest gave its passengers a contract-law cause of action in the event Southwest

failed to comply with federal air-safety regulations, as it turns out Southwest has in fact

failed to do.  In other words, Southwest gave its passengers the power to enforce its

promise of safety.  This, they here seek to do.

## II.   Southwest Repeatedly Violated Federal Airworthiness Directives And Other Federal Air-Safety Regulations

31.    Southwest breached its warranty by repeatedly violating federal

airworthiness directives issued by the Federal Aviation Administration.   "FAA's

airworthiness directives are legally enforceable rules that apply to the following products:

aircraft, aircraft engines, propellers, and appliances."  14 C.F.R. § 39.3.  Airworthiness

directives are issued pursuant to the FAA's authority under the Airline Deregulation Act:

"The Administrator of the Federal Aviation Administration shall promote safe flight of

civil aircraft in air commerce by prescribing . . . regulations and minimum standards in

the interest of safety for — (A) inspecting, servicing, and overhauling aircraft, aircraft

engines, propellers, and appliances; (B) equipment and facilities for, and the timing and

manner of, the inspecting, servicing, and overhauling."  49 U.S.C. § 44701(a).  As the

21

FAA, citing to 14 C.F.R. § 39.3, explains at the top of its airworthiness directives: "You are cautioned that no person may operate an aircraft to which an Airworthiness Directive applies, except in accordance with the requirements of the Airworthiness Directive." *See, e.g.,* Exhibit F (Airworthiness Directive). "Airworthiness Directives affect aviation safety and are regulations which require immediate attention." *Id.*

32.    "Airworthiness directives specify inspections you [the airline] must carry out, conditions and limitations you must comply with, and any actions you must take to resolve an unsafe condition." 14 C.F.R. § 39.11. "An air carrier shall make, or cause to be made, any inspection, repair, or maintenance of equipment used in air transportation as required by this part or regulations prescribed or orders issued by the Administrator of the Federal Aviation Administration under this part." 49 U.S.C. § 44713. "[A]n airworthiness directive applies to each product identified in the airworthiness directive, even if an individual product has been changed by modifying, altering, or repairing it in the area addressed by the airworthiness directive." 14 C.F.R. § 39.15. Current airworthiness directives are collected in part 39 of title 14 of the Code of Federal Regulations. *See* 14 C.F.R. §§ 39.1 ("The regulations in this part provide a legal framework for FAA's system of Airworthiness Directives."), 39.13 ("[A]irworthiness directives are part of the Code of Federal Regulations, but they are not codified in the annual edition. FAA publishes airworthiness directives in full in the Federal Register as amendments to § 39.13.").

33.    "FAA issues an airworthiness directive addressing a product when we [the FAA] find that: (a) An unsafe condition exists in the product; and (b) the Condition is likely to exist or develop in other products of the same type design." 14 C.F.R. § 39.5.

"Anyone who operates a product that does not meet the requirements of an applicable airworthiness directive is in violation of this section." 14 C.F.R. § 39.7. "If the requirements of an airworthiness directive have not been met, you violate § 39.7 each time you operate the aircraft." 14 C.F.R. § 39.9. Although an airline may propose alternative safety measures, it may not use these measures instead of complying with an airworthiness directive unless the FAA has approved the alternative in advance. *See* 14 C.F.R. §§ 39.19, 39.21. A violation of an airworthiness directive is a violation not only of 14 C.F.R. § 39.7, but also of the United States Code: "A person may not . . . (5) operate aircraft in air commerce in violation of a regulation prescribed or certificate issued under section 44701(a) or (b) or any of sections 44702–44716 of this title." 49 U.S.C. § 44711(a).

34.     Southwest repeatedly violated federal air-safety regulations by flying aircraft with damaged rudders or cracked fuselages and failing to inspect aircraft for these problems. The safety inspections and required maintenance that Southwest ignored were mandated by the FAA after two fatal crashes and one fatal accident, all involving Boeing 737's — the only type of aircraft that Southwest flies. Southwest flew aircraft in violation of federal air-safety regulations even after FAA inspectors and Southwest managers were aware of the problems with Southwest's aircraft. Southwest deliberately flew aircraft that, under the FAA's regulations, were not airworthy and were required by law to be grounded until fully compliant; in doing so, Southwest risked the lives of thousands of passengers and breached its promise to them that it had complied with all applicable federal air-safety regulations.

23

35.    Airworthiness Directive ("AD") 2004-18-06, attached as Exhibit F, requires repetitive inspections to find fatigue cracking of certain upper and lower skin panels of the fuselage, and follow-up and corrective actions if necessary.  Last year alone, 46 Southwest jets made 61,242 flights before Southwest admitted that the aircraft were 30 months overdue for safety inspections of their fuselages as required by AD 2004-18-06.  Southwest finally reported this gross deficiency to the FAA.  Even after Southwest discovered the problem, however, it continued to fly the aircraft for eight days, between March 15, 2007 to March 23, 2007, and on 1,451 flights. Federal rules say the planes should have been grounded immediately.  When Southwest finally inspected the planes, six of them were in fact found to have cracks in the fuselage.

36.    Southwest's Boeing 737's can carry between 122 and 137 passengers per flight.  Over the course of its deliberate violations of federal air-safety regulations, Southwest Airlines risked the lives of thousands upon thousands of men, women, and children — all passengers who contracted to fly Southwest aircraft believing Southwest's false warranty of safety and compliance with FAA AD's; of course, Southwest endangered its own crew and countless third parties as well.  Rather than expend the time, effort, and money on legitimate safety compliance, Southwest instead cut corners in an effort to keep the airline out of trouble and maximize its own profits.  Southwest performed the inspections it wanted to perform on its own schedule and at its own convenience.  Lax enforcement allowed Southwest to gamble with its passengers' lives. AD-2004-18-06 is designed to protect passengers and crew from catastrophic aircraft decompression.  Southwest's violation of AD-2004018-06 compliance failure is a gross

breach of passenger safety, a clear violation of federal law — and, hence, a clear violation of Southwest's express warranty to the contrary.

37.     In response to pressure from the House Transportation and Infrastructure Committee, including allegations that the FAA was complicit in Southwest's violations of federal air-safety regulations, the FAA assessed a $10.2 million civil penalty against Southwest for the violations of airworthiness directives described above.  According to the FAA, the amount of the civil penalty reflects the serious nature of those deliberate violations.   Southwest also chronically overflew a required rudder inspection. The inspection was meant to detect leakage in the standby rudder power control unit's hydraulic system — part of the steering mechanism for affected aircraft.  Southwest's violation was undetected for more than a year and affected 70 aircraft.  Some aircraft were over-flown by as much as 30 months.  Southwest self-disclosed this condition after discovering the problem on March 19, 2007.   Even after self-disclosing, however, Southwest continued to fly the aircraft in passenger revenue service for nine days because the airline lacked the "manpower and equipment" to comply with federal law.

38.     Southwest's violations of federal air-safety regulations were not limited to violations of airworthiness directives.  A few examples here suffice to make the point. On February 8, 2005, Southwest flew an aircraft that was struck by lightning.  After a scheduled stop in Jackson, Mississippi, where the lightning strike was investigated, the aircraft landed at its next destination, Baltimore/Washington International Airport ("BWI").   BWI is a maintenance base for Southwest Airlines.  The mechanic there observed lightning damage and directed the aircraft be taken out of service.  The captain submitted a standard Southwest Airlines Irregularity Report ("IR") about the incident.

He noted in the report that lightning-strike inspection procedures and training were lacking and difficulty ascertaining damage was common at Southwest. The lead mechanic in the maintenance supervision office at BWI encouraged the captain to make this notation because of chronic problems with inspections. Both circumstances are violations of federal air-safety regulations.

39.     The captain's chief pilot contacted him several weeks later about altering the information submitted in his IR. The captain asked why there was an issue with the report. The chief told him that the lightning-damaged aircraft that was supposedly grounded at BWI had flown approximately three more days without maintenance repair. The chief further advised the captain that the FAA was investigating the incident, and Southwest Airlines submitted the captain's report as part of the investigation. The captain felt pressured by his chief to alter the report to exclude the critical language regarding lightning-strike inspection procedures and training. The captain refused to alter the incident report because doing so would violate his legal and ethical obligations regarding safety issues governed by Federal Aviation Regulations.

40.     Second, a different Southwest captain alleges that Southwest pressured him to take off even though the runway did not meet minimum criteria for takeoff. Specifically, he alleges that the runway was not at least fifty percent clear of ice and snow, which is not in compliance with Southwest's FAA-approved Flight Operations Manual. This captain called his chief pilot and explained that the runway did meet the fifty-percent-cleared criterion. The chief told him to take off anyway because others had. The chief pressured this captain to break FAA-approved Flight Operations Manual safety rules.

41.    Third, still another Southwest captain piloted an aircraft destined for Providence (PVD). En route, he determined that the wind was out of limits according to the Flight Operations Manual, so the captain diverted the aircraft back to Baltimore/Washington International Airport (BWI). The wind was still out of limits when he arrived, but the chief pilot on call contacted him and pressured him to continue the flight. Southwest pulled this captain and his first officer from the flight and replaced them with a crew that would complete the flight.

42.    Fourth, multiple Southwest pilots have reported numerous incidents of Southwest dispatch bending rules to circumvent federal air-safety regulations regarding minimum weather requirements for landing. The regulations require that minimum weather standards must exist for plus/minus one hour. Dispatch merely rerouted flights to increase their flight time to circumvent this rule.

43.    Fifth, a Southwest Captain and former Southwest Airlines Pilot Association Safety Chairman reported a serious inspection lapse with older Boeing aircraft used in passenger revenue service. This captain discovered that Southwest decided not to inspect the last nine Boeing 737-200 series aircraft for a flap spindle issue. Failure of one side of the mechanism creates an asymmetrical flap situation, which creates adverse roll on the aircraft. This adverse roll could very likely result in a loss of control of the aircraft. The mean time between failure (MTBF) of this mechanism is listed at 16,000 hours, and some of the nine affected aircraft were at 25,000 hours. The captain asserts that this was an accident waiting to happen. After the initial maintenance investigation, Southwest Vice President of Flight Operations, Greg Crum, and Vice President of Maintenance, Ben Sokol, told the captain that Southwest inspected all of the

aircraft.  The captain suspected that this was untrue because the aircraft were due to be taken out of service soon.  The captain again conferred with the Union, and the Union President advised him to take action.  The Union released an Air Safety Alert advising the series-200 pilots not to fly the affected aircraft because of the fear of a likely crash.  The alert forced Southwest to inspect and repair the nine affected aircraft.

44.    What these incidents — almost 62,000 admitted flights in violation of the airworthiness directive governing inspection for cracked fuselages, 70 planes flown for 30 months past the required time for inspection of a critical steering component, official pressure on captains to violate federal air-safety regulations and falsify subsequent reports to the FAA, failure to correct critical problems when detected, and conscious efforts to circumvent applicable federal air-safety regulations — have in common is a cavalier attitude toward the federal air-safety regulations that Southwest is bound to obey and that it warranted to its passengers it had fully complied with.  As Nicholas Sabatini, associate administrator of the FAA put it:

> **A total of 1,451 commercial operations were conducted by Southwest Airlines in violation of the law, putting thousands of passengers at risk.**  That this was done with the implicit consent of the FAA PMI overseeing the carrier is beyond my comprehension.  I am also disturbed that, while the office manager began a review of this situation and asked for support from our Southwest Region Flight Standards Office (Region), it was not fully investigated until one of my front-line safety inspectors reported it to the Administrator's hotline and the DOT IG hotline.
>
> **On March 6, 2008, the FAA issued a $10.2 million proposed civil penalty to Southwest Airlines for its decision to knowingly continue to fly noncompliant aircraft in commercial operations.  This decision was inexcusable and put its passengers at risk. . . . I cannot overstate my disappointment and, frankly, outrage and shock at the actions of Southwest Airlines.**

Statement of Nicholas Sabatini, attached as Exhibit G, at 4–5 (emphasis added).

Additional detail to support these allegations will no doubt be discoverable; the facts gathered to date, both by Kleiner and by the House Committee on Transportation and Infrastructure and the United States Office of Special Counsel, are more than enough to justify Kleiner's complaint.

**III.     Southwest's Violations Were Not Merely Technical: Southwest Put Passengers' Lives At Risk**

45.     Airworthiness directives can be matters of life and death.  In 1988, fuselage cracks like those that Southwest failed to inspect for and that were in fact present in Southwest planes caused a Boeing 737 to suffer explosive decompression in midair.  A large section of the roof and the entire top half of the plane's skin from the cockpit to the forewing were torn off.  *See* Exhibit A (picture of airplane post-explosion). Chief Flight Attendant Clarabell Lansing was ejected from the plane; later, investigators found on the side of the plane the horrifying imprint of a head surrounded by blood stains; the tragic image became known as the "ghost imprint."

46.     In 1994, rudder control problems like those that Southwest failed to inspect for caused a Boeing 737 crash in Pittsburgh, Pennsylvania, killing 132 people. Three years earlier, a United Airlines Boeing 737 crashed in Colorado Springs, Colorado, killing 25 people.  Investigators blamed both crashes on problems in the aircraft rudder-control system, leading the FAA to demand regular checks of the 737's rudder-control system — the checks that Southwest decided to skip.

47.     The 1988 crash was a defining event in creating awareness of aging aircraft in both the public domain and in the aviation community.  The 19-year old Aloha Airlines Boeing 737-200, N73711, operated by Aloha as flight 243, experienced explosive decompression and structural failure at 24,000 feet, while en route from Hilo,

Hawaii, to Honolulu, Hawaii. Approximately 18 feet of the cabin skin and structure aft of the cabin entrance door and above the passenger floor line separated from the airplane during flight. There were 89 passengers and 6 crewmembers on board.  Lansing was killed.  In addition, seven passengers and one flight attendant received serious injuries. The flight crew performed one of the most heart-stopping emergency descents and landings of all time at Kahului Airport on Maui.  The National Transportation Safety Board ("NTSB") traced the explosion to a small crack in the fuselage of the Boeing 737 — the same kind of plane flown by Southwest and the same kind of crack that Southwest ignored and covered up so regularly.

48.    Southwest, which carries more passengers in the United States than any other carrier, had not been following the maintenance schedule instituted by the FAA to check for cracks. According to the FAA, the infraction involved 46 737's used on 61,242 revenue flights before the airline noticed that the planes were 30 months overdue for fuselage safety inspections.  Southwest eventually self-reported the mistake to the FAA. Federal rules say the planes should have been immediately grounded, but, even after Southwest discovered the lapse, Southwest allowed several of the jets to continue flying. When inspected, six of them actually had cracks of the sort that caused the Aloha explosion.

49.    The Aloha aircraft had been in service for 19 years and had completed tens of thousands of short-haul inter-island flights.  Repeated pressurization cycles allowed fuselage cracks to propagate. Since then, airline maintenance procedures have been revised to better monitor structural fatigue — including AD 18-2004-06, the airworthiness directive that Southwest violated with respect to 61,242 flights.  Boeing

and the FAA developed a careful schedule of inspections dependent on both total airframe hours and number of takeoffs and landings, or "cycles."

50.     Southwest's 737s are newer on average than the "classic" model involved in the Aloha mishap, but Southwest too specializes in shorter-haul flights — lots of them. All airlines strive to keep their aircraft in the air as much as possible, but Southwest does this while also maximizing cycles. It has one of the highest aircraft-utilization rates in the industry, scheduling as little as 30 minutes between legs. Because of the repeated pressurization and depressurization this entails, Southwest's fleet runs a higher risk than most of developing fatigue problems.

51.     In its report on the Aloha Airlines accident, the NTSB determined that "the probable cause of this accident was the failure of the Aloha Airlines maintenance program to detect the presence of significant disbonding and fatigue damage which ultimately led to failure of the lap joint at S-10L and the separation of the fuselage upper lobe (rapid decompression and loss of structural integrity of the plane). Contributing to the accident were the failure of Aloha Airlines management to supervise properly its maintenance force; the failure of the FAA to require Airworthiness Directive 87-21-08 inspection of all the lap joints proposed by Boeing Alert Service Bulletin SB 737-53A1039; and the lack of a complete terminating action (neither generated by Boeing nor required by the FAA) after the discovery of early production difficulties in the B-737 cold bond lap joint which resulted in low bond durability, corrosion, and premature fatigue cracking." *Aircraft Accident Report, Aloha Airlines, flight 243, Boeing 737-200, N73711, near Maui, Hawaii April 28, 1988  NTSB Number AAR-89/03, NTIS Number PB89-910404*, attached as Exhibit H.

52.     NTSB incident reports generally state the specific safety issues raised in each incident.   The fatal Aloha incident raised three: (1) The quality of air-carrier maintenance programs and the FAA surveillance of these programs; (2) the engineering design, certification, and continuing airworthiness of the B-737 with particular emphasis on multiple-site fatigue cracking of the fuselage lap joints; and (3) the human-factors aspects of air-carrier maintenance and inspection for the continuing airworthiness of transport-category airplanes, including repair procedures and the training, certification and qualification of mechanics and inspectors.   Recommendations concerning these issues were addressed to the FAA, Aloha Airlines, and the Air Transport Association. The FAA responded by mandating detailed inspections of Boeing 737s specifically for fuselage cracks that can cause loss of structural integrity and explosive decompression in midair.

53.     When an airline discovers non-compliance with an airworthiness directive, the airline may make a voluntary disclosure under the Voluntary Disclosure Reporting Program ("VDRP") in order to avoid certain penalties.   Advisory Circular 00-58A provides the guidelines for the VDRP.   Under this Circular, entities which operate under Title 14, such as airlines, may voluntarily disclose violations to the FAA and receive a letter of correction in lieu of a civil penalty.   However, in order to avoid civil penalties, specific procedures must be followed with respect to the reported non-compliance.   After self-disclosure, non-compliance with the airworthiness directive must cease as of the date the non-compliance is discovered.   This includes termination of the operation of the affected aircraft until the requirements of the airworthiness directive have been met.

More importantly, the VDRP is a way to avoid regulatory fines, not an excuse for the earlier underlying failure to comply with the airworthiness directive.

54.     According to Chairman James Oberstar of the House Committee on Transportation and Infrastructure, Southwest's intentional and continuing safety violations represent "the most serious lapse in safety at the FAA in the past 23 years. Complacency may have set in at the highest levels of FAA management, reflecting a pendulum swing away from vigorous enforcement of compliance, toward a carrier-favorable cozy relationship. Meanwhile more and more airline maintenance is being outsourced with less FAA and airline involvement, much of it at foreign repair stations." According to Senator Murray (D-WA), "These grotesque safety violations on the part of Southwest Airlines are inexcusable, and so too are the actions of the FAA.  While the FAA is right to assess serious fines for these violations, we need to ask serious questions as to why it took the FAA so long to discover them.  The taxpayers pay hundreds of millions of dollars every year to employ thousands of inspectors to discover these potential abuses before they occur.  But in this case, it appears that our federal watchdog knowingly looked the other way."

55.     Southwest did not engage in a few technical violations, quickly cured. Southwest flew planes in violation of airworthiness directives and other federal air-safety regulations that the FAA enacted in response to actual air-transport catastrophes. Southwest put its passengers' lives at risk as well as those of its crew and countless other third parties.  And it did so even after becoming aware of its safety violations, in a grossly misguided attempt to maximize profits at the expense of passenger safety.  If anything, Southwest's claimed special knowledge of the hazards of cracked fuselages

makes its violations of the relevant regulations even worse:

> Southwest has grown to be the largest carrier of passengers in the world with an all-Boeing fleet of over 500 737's. Southwest was the launch customer for three models of the 737: the -300, -500, and -700. As the airline of choice for 100 million people last year, and the largest 737 operator by far, Southwest has more experience with 737's than any other airline in the world.

> Ironically, **the very AD at issue in this investigation might not have come about had it not been for Southwest's vast experience and expertise with the 737. The AD was based on a Boeing Service Bulleting. That Service Bulletin, in turn, was based in large part on a pre-existing maintenance program developed by Southwest.** It was our observations with respect to cracking of the "chemically-milled" 737 skin panels on the Classic 737-300 and the 737-500, coupled with our own rigorous inspection program (conducted four times as often as the AD inspections), that were the genesis of the Boeing Service Bulleting and the "Chem Mill" AD.

Ex. I at 2 (emphasis added). When it supposedly wrote the airworthiness directive that it has since violated, Southwest concluded there was a safety problem to be addressed. Southwest's recent denials of these problems in the face of a Congressional investigation lack credibility.

## IV.    Until Recently, Southwest Got Away With Endangering Its Customers And Others

56.     Southwest's violations of federal air-safety regulations came to light when two FAA inspectors blew the whistle on Southwest's too-cozy relationship with the FAA field officials responsible for ensuring its compliance. Whistleblowers C. Bobby Boutris and Douglas E. Peters disclosed to the United States Office of Special Counsel that Douglas T. Gawadzinski, the former Supervisory Principal Maintenance Inspector (SPMI) at the Southwest Airlines Certificate Management Office (Southwest CMO) "violated FAA national policy and regulations governing the maintenance of aircraft by airlines." *See* Statement of C. Bobby Boutros, attached as Exhibit J; Statement of

Douglas E. Peters, attached as Exhibit K.  The United States Office of Special Counsel investigated Boutris's and Peters's claims and found a "substantial likelihood" that these claims were true.  *See* U.S. Office of Special Counsel Report of Disclosures Referred For Investigation OSC FILE Nos. DI-07-2793 and DI-07-2868.   In the Special Counsel's words, Southwest's conduct "reflect[s] the cronyism that has infected the inspection process, and affected the attention given to safety issues as well as the commitment to public safety at the core of the FAA's mission." *See* Exhibit B at 8.

57.     Boutris worked in the field of aviation maintenance and inspection in the private sector for approximately 20 years before joining the FAA in 1998.  He began working with the FAA as an Aviation Safety Inspector in the Dallas/Fort Worth Flight Standards District Office.   Boutris held several positions in that office eventually becoming the Principal Maintenance Inspector for several air carriers.  In March 2003, he requested and received an assignment to the SWA CMO and worked as one of the maintenance Partial Program Managers ("PPM") for the Boeing 737-700 fleet.

58.     Boutris and Peters disclosed that their supervisors, FAA managers, blocked investigations of Southwest Airlines while colleagues leaked sensitive information to the carrier regarding inspection schedules and potential investigations which might curtail  Southwest's profit.  For example, FAA inspector Larry Collamore ("Collamore") was aware that the aircraft was not safe but failed to either challenge Gawadszinksi's plain violations of FAA safety policies and regulations or report the safety issues.  Taking aircraft out of service to comply with FAA safety regulations would have disrupted Southwest Airlines' flight schedule.  According to Boutris and Peters, Southwest's knowing and deliberate violations of FAA national policy and

regulations has resulted in "chronic, systematic, and repetitive non-compliance maintenance issues." These have been made worse by a too-close relationship between Southwest and the FAA:

> What is interesting here is that in reading this VDRP report, under the "INFORMATION OF THE PERSON PREPARING THE COMPREHENSIVE FIX" for SWA, is the name Paul Comeau. Mr. Comeau is an ex FAA Safety Inspector who was performing oversight inspections for regulatory compliance issues regarding the SWA Certificate at the SWA CMO with Mr. Gawadzinski. While working for the FAA, Mr. Comeau accepted a job offer from SWA as the Manager of Regulatory Compliance. I believe that **SWA knowingly hired Mr. Comeau for his FAA connections with inspectors in our office, and to their advantage placed him in the position that directly interfaces with our office on a daily basis in regards to Regulatory Compliance issues in dealing with aircraft maintenance.**
>
> I questioned Mr. Comeau's hiring by SWA, and I was told by Mr. Gawadzinski that his hiring was cleared through our Regional Office, but there is an ethics issue here, and as proven a conflict of interest. The Regional Office should have considered the importance of the position that SWA hired Mr. Comeau for, and the impact on safety that might have had. . . . I believe **the cozy relationship between Mr. Gawadzinski and Mr. Comeau played a contributing factor and allowed the 47 aircraft to remain in revenue service** and operate in a manner that would provide relief to schedule the AD overdue inspections at the SWA's convenience while flying paying passengers and without disrupting SWA's flight schedule. I also believe **this cozy relationship was the reason that SWA hired Mr. Comeau for this position**. Mr. Comeau, being an ex-FAA Inspector should have known that AD inspection requirements are mandatory and address unsafe conditions, they teach that to FAA Inspectors at the Academy.

Ex. J. at 5–6 (Statement of C. Bobby Boutris) (emphasis added). Again:

> The airlines take advantage of the customer service initiative and they constantly remind us they are the customer. **The best way to put it is like you are going down the highway committing traffic violations and jeopardizing the safety of others and when the police officer stops you and informs you that you are breaking the law by endangering people's lives you tell him that he cannot document the violation because you are his customer.** I know it sounds funny but this is as close to an example as I can come up with.

*Id.* at 11 (emphasis added).

59.     On February 6, 2008, the Chairman of the House Committee on Transportation and Infrastructure requested that the Inspector General for the Department of Transportation investigate whether FAA's Security and Hazardous Materials Division thoroughly investigated this matter and took corrective actions in a timely manner. The Chairman stated that Boutris and Peters provided detailed documentation showing that an FAA inspector, responsible for overseeing Southwest Airlines, demonstrated extremely poor judgment by allowing the air carrier to operate aircraft in revenue service without properly inspecting the aircraft for fuselage cracks.  According to Chairman Oberstar:

> **The Committee's investigation uncovered a pattern of regulatory abuse and widespread regulatory lapses that allowed 117 aircraft to be operated in commercial service despite being OUT OF COMPLIANCE with Airworthiness Directives** and other mandatory inspections . . . so that Southwest could conveniently schedule them for inspection without disrupting their commercial schedule.  These overflight violations occurred after Southwest had self-disclosed to the FAA that it had discovered that these planes were not in compliance.  The Southwest disclosure claimed that the violations ceased upon the date of disclosure, and by Federal law these aircraft should have been grounded until they were in compliance, but they continued to fly, with full knowledge of the FAA supervisor for maintenance at Southwest. . . .
>
> **We have reason to believe there may have been more such violations, since there is strong evidence of systemic flaws in Southwest's Airworthiness Directive management systems.**     A required Airworthiness Directive Safety Attributes Inspection at Southwest, due in 2004, was not conducted until 2007, three years overdue. . . .
>
> **Over at least a 3-year period prior to the overflights mentioned above, the Director of the Regional Flight Standards Division, which oversees the offices supervising Southwest, American, American Eagle, Continental and other operators located in that region, was sent 38 e-mails expressing concerns of inspectors that Southwest was not keeping adequate records of its compliance with airworthiness directives and required maintenance inspections.**  Nothing was done, and as a consequence neither Southwest nor FAA detected the airline's failure to conduct required fuselage inspections for 30 months.  The

inspectors raising these issues were never given the dignity of any kind of answer. . . .

Thank goodness that this is all happening BEFORE a fatal accident, which is as it should be, NOT AFTER a tragedy. Doubtless some will argue that these compliance violations offered no serious threat to the flying public. No crash happened, no one died. But that is an irresponsible argument. It would be consistent with the "tombstone mentality" that I have been fighting in FAA and other agencies my entire career.

Opening Statement, Oversight Hearing, House Committee on Transportation and Infrastructure (April 3, 2008) (emphasis added) (first ellipsis in original), attached as Exhibit M.

60.     After conducting an internal investigation in March 2008, Southwest switched from defending the airline's maintenance practices to suspending three maintenance employees and grounding aircraft to re-inspect them for possible cracks. Southwest found that 46 of its Boeing 737's had to be inspected to comply with AD 2004-18-06.   Southwest found cracks on roughly half a dozen of those aircraft. Southwest had previously disclosed to the FAA that it missed inspecting a small area required by the AD, according to Southwest CEO Gary Kelly, and "the fix was agreed upon with the FAA, and it was executed properly."

61.     Southwest hired former NTSB investigator Greg Feith ("Feith") to consult on the inspection problem.  In a March 7 statement Feith said, "Based on the available data and information reviewed, it is apparent that there was no risk to the flying public in March 2007 while Southwest Airlines performed its program to re-inspect the small area of aircraft fuselages identified in the AD inspection that was inadvertently missed."

62.     Despite Feith's expert assessment, paid for by Southwest, the immediate and broad actions taken by Congress, the U.S. Office of Special Counsel, the U.S.

Inspector General, and the FAA paint a different picture.  As actions often do, these speak louder than Southwest's and Feith's words — illuminating the serious and potentially deadly consequences of Southwest's deliberate safety violations.  Boutris aptly articulates the point:

> SWA is reporting that according to Boeing there was no safety issue regarding the 47 aircraft that were flying passengers with the overdue AD inspections in which six of them had cracks on the fuselage.  **It is nice of Boeing to offer an opinion for their largest customer; however, if aircraft manufacturers could predict accidents we would not have the safety requirements of this AD today.**
>
> In addition, consultants have been reporting that after reviewing the data and due to the fact that the area of the fuselage that is affected by the AD includes tear straps and bonded doublers in their opinion safety was not jeopardized.  I am reporting to you that the only factual data that we have is that the 47 aircraft were flying out of compliance for 30 months and six of them had cracks on their fuselage and were allowed to fly in revenue service with a known unsafe condition for an additional 8 days after the date of discovery.  **I could not imagine what type of data the consultants reviewed because there is no data that shows how long an aircraft can fly out of compliance with multiple cracks on its fuselage before it splits open.  The documented proof we have is the Aloha Airlines aircraft that lost the top of its fuselage in flight due to undetected cracks, and for the record that aircraft also had the tear straps and bonded doublers that the consultants are referring to.  In addition, for the record, the existence of the tear straps and bonded doublers was taken in consideration when the mandatory requirements of this AD were established**. . . .
>
> I am reporting to you that **contacting Boeing for an opinion or hiring a consultant is not an option because neither one has any authority over the mandatory requirements of an AD, and that is the law**.  The majority of the Ads are the result of catastrophic accidents, and as the industry saying goes **"AD's are written in blood."  I am very concerned because these safety issues affect the lives of the flying public and instead of being advocates for safety some people are still trying to mud the water by downplaying this serious safety issue.**  The taxpayers and the flying public deserve better and I hope the truth along with some overdue changes come out of this hearing.

Ex. J at 9–10 (Statement of C. Bobby Boutris) (emphasis added).   Southwest executive chairman Herb Kelleher's testimony highlights Boeing's conflict of interest:

> Boeing credits Southwest with single-handedly keeping the 737 assembly line open on two separate occasions: once during the Gulf War when oil prices spiked and a deep recession diminished passenger traffic, and again after 9/11.

Statement of Herb Kelleher, attached as Exhibit I, at 2.

63.    On the same day as Feith's "no risk to the flying public report", Rep. James Oberstar held a press conference in which he alleged, "Southwest Airlines, with FAA complicity, allowed at least 117 of its aircraft to fly with passengers in violation of [FARs]. Forty-seven were overdue for required fuselage inspections, and 70 were overdue a mandatory inspection of critical rudder control systems." Representative Oberstar accused FAA management of complacency, "reflecting a pendulum swing away from vigorous enforcement of compliance, toward a carrier-favorable, cozy relationship." Representative Oberstar also noted that the "result of the [FAA] inspection failures, and enforcement of failure, has meant that aircraft have flown unsafe, unairworthy, and at risk of lives."

64.    On March 11, a national team of FAA inspectors began an Air Carrier Evaluation Program review of Southwest Airlines' AD management, continuing analysis and surveillance, and inspection programs.  Nicholas Sabatini, Associate Administrator for Aviation Safety, directed his top 88 senior safety leaders from across the nation to meet with their staffs to strongly review and reinforce ethical, managerial and operational responsibilities in the regulatory process. They were charged with communicating to all staff the roles and responsibilities outlined in the regulatory process as it applies to airline compliance and they were directed to review the importance of complying with national

40

policies and processes to assure consistent application of the safety standards.  (FAA Press Release, April 2, 2008)

65.     On March 11, the FAA began a national Air Carrier Evaluation Program campaign that will focus on a review of the design and effectiveness of the air carrier programs.   2008: Beginning with Southwest Airlines, FAA inspectors will verify compliance with regulations regarding airworthiness directives, inspection programs, and management of maintenance programs.  2009 and beyond: The focus will be determined by analysis of current conditions such as trends in surveillance, outsourcing, or financial conditions.

66.     On March 12, Acting FAA Administrator Robert A. Sturgell and his top safety executives met with the senior leadership of Southwest Airlines. Gary Kelly, Southwest's Chief Executive Officer and Vice Chairman of the Board, outlined the steps the airline is taking to ensure its aircraft comply with all airworthiness directives. He also discussed the progress of reviews being conducted by Southwest's maintenance staff and the independent group hired by the airline. During the meeting, Southwest Airlines notified the FAA that, as part of an internal safety audit, they grounded 41 aircraft the previous evening until they could verify with the FAA that they had correctly followed inspection guidance stated in an AD related to a specific area of the aircraft surrounding the windows on 737-300's and -500's.

67.     On March 13, the FAA initiated an audit of AD compliance at all 118 U.S. air carriers.  The initial review was completed on March 28. Inspectors assessed air-carrier compliance by auditing a sample of 10 ADs, including two directives (2002-07-08 and 2004-18-06) addressing fatigue cracking on certain Boeing 737s. Inspectors validated

41

that air-carrier work instructions correctly described the method of compliance contained in the 10 AD's and, in addition, physically inspected the complete work package on at least one aircraft. Inspectors will complete a random sample of 10 percent of the AD's per carrier fleet by June 30. The agency will notify inspectors of an amendment to the Voluntary Disclosure Reporting Program guidance to require that reports be submitted by a senior airline official such as the Director of Safety, the Director of Operations or the Director of Maintenance.

68.     On March 14, the Aviation Safety Organization provided all supervisors the specific chain of events and timeline from the Southwest incident to serve as a case study for corrective actions by regulators, management, airlines, and anyone with supervisory or oversight responsibility.

69.     On March 18, Associate Administrator Sabatini conducted a town-hall meeting for all 6,800 Aviation Safety employees to personally ask all safety and inspection staff to redouble efforts to adhere strictly to all directives and guidelines as well as to work vigorously to manifest the benefits of the voluntary-reporting system, which allows airlines to make voluntary, timely disclosures before there is any threat or likelihood of an impact to safety. By June 30, the FAA will start a rulemaking project to address ethics policies that enhance inspector post-employment restrictions, bringing them in line, or possibly exceeding, existing restrictions for other federal employees. Currently, FAA prohibits new inspectors who are hired from an airline from overseeing that airline for a period of two years.

70.     The Aviation Safety Organization has designed and will deploy the Safety Issues Reporting System (SIRS) by April 30. The new system will allow an employee to

document and escalate a safety issue to their supervisor/manager or escalate the safety issue directly to headquarters if they believe the issue needs immediate attention. SIRS will supplement resources already available to employees, such as the Administrator's Hotline and the Safety Hotline. The Aviation Safety Organization is working with the manufacturers and air carriers to develop a system to assure that ADs are written clearly and can be implemented by the industry.

71.     By June 30, the Aviation Safety Organization will survey all employees to assess the effectiveness of workplace communications, values, and guiding principles. On August 25, the Aviation Safety Organization will convene a meeting of more than 700 managers to discuss the survey results and develop detailed action plans. Based on the survey results, managers will look towards the creation of enhanced training or communications projects that will supplement existing programs. By September 30, the Aviation Safety Organization will add a module to the training course for new managers on leadership, accountability, and expectations.

## CAUSES OF ACTION

### I.     Breach of Express Warranty

72.     Plaintiffs incorporate all allegations made in this First Amended Complaint as if repeated in full here.

73.     The elements of a breach-of-warranty claim are: (1) the defendant sold services to the plaintiff; (2) the defendant made a representation to the plaintiff about the quality or characteristics of the services by (a) affirmation of fact, (b) promise, or (c) description; (3) the representation became part of the basis of the bargain; (4) the defendant breached the warranty; and (5) the plaintiff suffered injury. *See, e.g.,*

*Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W.2d 572, 576, 576 n.3 (Tex. 1991) (typical of state laws). Each of these elements is present here. The contract between Southwest and its passengers does not require demand upon breach of warranty. Therefore, demand by the passengers is not an element of a breach-of-warranty action by them.

74.     First, Southwest sold the service of air travel on its aircraft to Kleiner and the class members.   In particular, Southwest sold the service of air travel on safe aircraft that legally could fly in the United States.

75.     Second, Southwest warranted that the travel it sold was in compliance with federal air-safety regulations. Southwest's "Sixth Amended Contract of Carriage — Passenger," attached as Exhibit C, provides:

> 125. <u>Compliance with Law and Governmental Regulations</u> (Issued Mar. 13, 2000; Effective Mar. 13, 2000)
>
> All transportation is sold and all carriage is performed subject to compliance with all applicable laws and governmental regulations, including those of the U.S. Department of Transportation, the Federal Aviation Administration, and the Transportation Security Administration, many of which are not specified herein but are nonetheless binding on Carrier and all passengers.

Ex. C at 35. This is a non-negotiable form contract of adhesion drafted entirely by Southwest and offered to passengers on a take-it-or-leave-it basis.   Paragraph 125 constitutes an affirmation of the fact that "[a]ll carriage is performed subject to compliance with all applicable laws and governmental regulations," a promise to the same effect, and a description of "[a]ll transportation" and "all carriage" — namely, that all transportation and carriage are in "compliance with all applicable laws and governmental regulations." Importantly, "It is not necessary to the creation of an express

44

warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty." *Southwestern Bell*, 811 S.W.2d at 576 n.3.

76.     Third, this warranty became part of the basis for the bargain between Southwest and its passengers because it goes to a subject that is objectively central to the bargain — whether Southwest could legally perform it, since Southwest could only legally fly aircraft in compliance with federal air-safety regulations, and whether it would be safe for the passengers to fly on Southwest's aircraft — and concerns facts under the unique possession and control of the warrantor, Southwest — namely, whether Southwest institutes and follows a maintenance program that ensures compliance with federal air-safety regulations.  Moreover, Southwest's warranty was a basis for the bargain because it was an inseparable part of the bargain, included in the Contract of Carriage that constituted and documented the bargain.  Southwest's warranty does not depend on any extra-contractual statement and, therefore, there can be no doubt that it is part of the basis of the bargain.

77.     Fourth, Southwest breached this warranty by transporting passengers in aircraft with respect to which, as described above, Southwest violated federal air-safety regulations and laws.

78.     Fifth, this breach damaged Southwest's passengers because they paid for safe and legal flights, but received unsafe or illegal flights instead, and safe and legal flights have a higher fair market value than unsafe or illegal flights.  Southwest's passengers overpaid because they paid for compliance with Southwest's warranty but did not receive it.  The measure of these damages is the difference in fair market value

between the unsafe or illegal transportation that Southwest provided and the safe and legal transportation that Southwest promised. Moreover, the value of transportation on unsafe or illegal planes is zero; the measure of damages is therefore the full price Southwest's passengers paid. This is because no one would have (or could have, since flying the aircraft would have been illegal) flown Southwest had Southwest revealed that it was violating federal air-safety regulations.

## II.    Texas Deceptive Trade Practices Act

79.    Plaintiffs incorporate all allegations made in this First Amended Complaint as if repeated in full here.

80.    Southwest's breach of its express warranty of compliance with applicable federal air-safety regulations by flying planes that, under these safety regulations, should have been grounded violates the DTPA because (1) Kleiner and the class members are consumers who (2) sought or acquired services by purchase from Southwest, (3) Southwest's acts constitute breach of an express warranty and an unconscionable action or course of action, and (4) Southwest's actions were a producing cause of the damages described *infra*, at paras. 87 – 94 (section entitled "DAMAGES"). *See* Tex. Bus. & Comm. Code §§ 17.41–17.63; *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) (stating elements).

81.    Kleiner is a consumer because he is an individual and purchased travel from Southwest for a non-commercial, non-business use. *See id.* §§ 17.45(4), 17.45(10) (defining *consumer* and *business consumer*). The class members are consumers for the same reason or because, although they purchased travel for a commercial or business use, they have less than $25 million in assets and are not controlled by an entity with at least

46

$25 million in assets.  Alternatively, for purposes of this claim, Kleiner seeks to represent a subclass composed of those class members who qualify as consumers under the DTPA.

82.    Kleiner and the class members sought or acquired services by purchase from Southwest.  Tex. Bus. & Comm. Code § 17.45(4).  In particular, they purchased travel on Southwest aircraft that Southwest warranted were in full compliance with applicable federal air-safety regulations.  To the exent that Kleiner and the class members had the services acquired for them by another, because the primary purpose of the acquisition was to benefit Kleiner or the class member, Kleiner and the class members are still "consumers" for purposes of the DTPA.  *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 815 (Tex. 1997); *Clark Equip. Co. v. Pitnere*, 923 S.W.2d 117, 127-28 (Tex. App.--Houston [14th Dist.] 1996).  Thus, even those class members who purchased tickets through a purchasing agency, ticket agent, or other intermediary qualify as plaintiffs under the DTPA.

83.    The DTPA allows Kleiner and the class to bring an action against any person who uses or employs false, misleading, or deceptive acts or practices.  These acts or practices include Southwest's breaching its express warranty of compliance with all applicable federal air-safety regulations and, independently, its flying passengers on unsafe or illegal aircraft in violation of federal air-safety regulations.  Tex. Bus. & Comm. Code 17.50(a)(1); *Miller v. Keyser*, 90 S.W.3d 712, 715 (Tex. 2002).  Southwest breached an express warranty as described above.  *See* paras. 72 – 78, *supra* (Breach of Express Warranty).  Southwest is a "person" for purposes of the DTPA because it is a corporation or other group, however organized.  Tex. Bus. & Comm. Code 17.45(3); *Miller*, 90 S.W.3d at 715.  Southwest's deceptive acts or practices were committed in

47

connection with the transactions between Kleiner and the class members and Southwest in purchasing Southwest's air-travel services, *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 650 (Tex. 1996), and were   inextricably intertwined with these consumer transactions, *Qantel Bus. Sys. v. Custom Controls Co.*, 761 S.W.2d 302, 305 (Tex. 1988). This is because the safety and legality of Southwest's aircraft goes to the core of the bargain between Kleiner and the class members and Southwest and because Southwest made its warranty of compliance with all applicable federal air-safety regulations in its form Contract of Carriage between Kleiner and the class members and Southwest.

84.     Southwest also engaged in an unconscionable action or course of action. Tex. Bus. Com. Code 17.50(a)(3).  Southwest's actions were unconscionable because they were to Kleiner's and the class members' detriment and took advantage of Kleiner's and the class members' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.  Tex. Bus. & Com. Code 17.45 (5); *Latham v. Castillo*, 972 S.W.2d 66, 68 (Tex. 1988).  The resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated.  *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001).  Whether Southwest complied with federal air-safety regulations was entirely in Southwest's control; Kleiner and the class members had no way of verifying Southwest's compliance other than by relying on Southwest's obligation to obey federal law and its express warranty to them that it would do so.  Kleiner and class members need not prove intent, reliance, or any specific representation.  *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998) (intent not necessary); *Mays v. Pierce*, 203 S.W.3d 564, 572 (Tex. App.--Houston [14th Dist.] 2006, pet. denied) (reliance not necessary); *Monsanto Co. v. Altman*, 153 S.W.3d 491, 495 (Tex. App.--Amarillo 2004, pet. denied) (reliance not necessary); *Teague v.*

48

*Bandy*, 793 S.W.2d 50, 54 (Tex. App.--Austin 1990, writ denied) (specific representation not necessary). Southwest's unconscionable act or practice occurred within the context of the sale of services and was in connection with Kleiner's transactions as well as those of the class members.

85. Southwest's flying unsafe or illegal flights was the producing cause of Kleiner's economic damages, set out above and below, including in the section entitled "DAMAGES," because these damages constitute the difference in value between Southwest's services as promised, safe and legal flights, and Southwest's services as Southwest delivered them, unsafe or illegal flights, and this difference in value arose only because Southwest breached its warranty by delivering unsafe or illegal flights instead of safe and legal ones. Southwest's acts were both a cause-in-fact and a substantial factor in causing Kleiner's and the class members' injuries. *Alexander v. Turner & Assocs.*, 146 S.W.3d 113, 117 (Tex. 2004). Kleiner and the class members suffered economic damages, including out-of-pocket damages, benefit-of-the-bargain damages, and compensatory damages for pecuniary loss. *See* paras. 87 – 94, *infra*.

86. These economic damages should be trebled because Southwest knowingly violated the DTPA in that it was aware that its maintenance program did not ensure its compliance with federal air-safety regulations. Tex. Bus. & Comm. Code § 17.50(b)(1). A successful consumer can recover treble economic damages, as found by the trier of fact — here, the jury:

> (b) **In a suit filed under this section, each consumer who prevails may obtain**:
>
> > (1) **the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly**, the consumer may also recover damages for

mental anguish, as found by the trier of fact, and **the trier of fact may award not more than three times the amount of economic damages**; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages;

(2) an order enjoining such acts or failure to act;

*Id.* § 17.50(b) (emphasis added).   Southwest committed a knowing violation because, at the time of the act or practice made the subject of Plaintiff's Amended Complaint, Southwest acted with actual awareness of the falsity, deception, or unfairness of the act or practice.   Tex. Bus. & Comm. Code 17.45(9).   Southwest also committed a knowing violation because it acted with actual awareness of the act, practice, condition, defect, or failure that constituted the breach of warranty.   Tex. Bus. & Comm. Code 17.45(9). Actual awareness can and should be inferred when objective manifestations indicate that Southwest acted with actual awareness.   Tex. Bus. & Comm. Code 17.45(9); *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53 (Tex. 1998).   Kleiner and the class members also seek all equitable relief under the DTPA, including an order "enjoining an act or failure to act," Tex. Bus. & Comm. Code § 17.50(b)(2)), by Southwest, as well as an order to restore money acquired from Kleiner and the class members in violation of the DTPA.   Tex. Bus. & Comm. Code 17.50(b)(3).

## DAMAGES

87.   Plaintiffs incorporate all allegations made in this First Amended Complaint as if repeated in full here.

88.   Kleiner and the class members suffered actual damages — including benefit-of-the-bargain damages, out-of-pocket damages, diminution-in-value damages, and overpayment damages — in that they paid for a service of a certain value, travel on

safe and legal aircraft, and received instead a service of lesser value, travel on unsafe or illegal aircraft. And they did so in a contractual context in which the service provider, Southwest, expressly warranted the feature of the service that gave rise to this difference in value, namely, Southwest's compliance with federal air-safety regulations. *Cf. Trustees of the Northwest Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, 27 F.3d 153, 157–60 (5th Cir. 2004) (affirming plaintiff's summary judgment awarding full price of medical services as actual damages where doctor failed to disclose that services were illegal).

89.     The Fifth Circuit has repeatedly held that damages like these are recoverable on a breach-of-warranty theory. Just last year, the Fifth Circuit held that purchasers of allegedly defective Cadillac DeVilles had constitutional standing to sue for just the sort of damages that Kleiner and the class members here seek. "Plaintiffs seek recovery for their actual economic harm (e.g., overpayment . . .) emanating from the loss of their benefit of the bargain. Notably in this case, plaintiffs may bring claims under a contract theory based on the express . . . warranties they allege. . . . We therefore conclude that plaintiffs have established a concrete injury in fact and have standing to pursue this class action." *Cole v. General Motors Corp.*, 484 F.3d 717, 722–23 (5th Cir. 2007). *Cole* held that diminution in value or overpayment constitutes a cognizable injury on a breach-of-warranty claim.

90.     Chief Judge Jones, joined by Judges Jolly and Smith, addressed the damages question squarely for the Fifth Circuit in 2001. *See Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 452 (5th Cir. 2001). The Fifth Circuit emphasized that the difference-in-value damages that Kleiner and the class members seek in this case are